## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RHONDA N. BAIRD, Pro Se             ) | |
|                      ) | |
|       Plaintiff,           ) | |
|                      ) | |
|         v.              ) | |
|                      ) | Civil Action No. 09-1091(ESH) |
| VINCENT SNOWBARGER,     ) | |
| Acting Director,           ) | |
| Pension Benefit Guaranty Corporation  ) | |
|                      ) | |
|       Defendant.        ) | |
| _____) | |

## FIRST AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

### Preliminary Statement

1. Rhonda Baird (the "Plaintiff") respectfully submits this First Amended Complaint

   pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as

   amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16, and

   as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a (hereinafter collectively

   referred to as "Title VII") to redress discrimination suffered on the basis of race, color,

   sex, and retaliation arising from the actions of her employer, the Pension Benefit

   Guaranty Corporation (hereinafter "Defendant", "Agency" or "PBGC").  Plaintiff's

   claims generally relate to a pattern of conduct by PBGC's labor management officials

   that involve ongoing abuses of PBGC's investigative and discipline authority to

   discriminate and retaliate against Plaintiff—violations for which PBGC was previously

   specifically found liable for committing against the Plaintiff.  Plaintiff filed her original

   Complaint on June 15, 2009.  Plaintiff now files this First Amended Complaint to make

certain corrections and additions to her original Complaint and to include formal EEO

complaints, which are now administratively exhausted.

## Jurisdiction and Venue

2.   Pursuant to Title VII, 42 U.S.C. § 2000e-16(c), this Court has jurisdiction over the

claims raised herein because Plaintiff has exhausted her administrative remedies.

3.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. §§412 and

464(b)(2) because all of the actions or omissions giving rise to Plaintiff's claims

occurred in the District of Columbia within the jurisdiction of the United States Court for

the District of Columbia.  Additionally, the Defendant is located in this judicial district.

## Parties

4.   Plaintiff is an African-American female who resides at 13615 Layhill Road, Silver

Spring, Maryland, 20906.

5.   Defendant, PBGC, is a federal agency headquartered at 1200 K Street N.W., Washington

D.C. 20005.  The events described in this complaint occurred at PBGC's headquarters.

6.   At all times relevant to this case, the Defendant has been an employer engaged in an

industry affecting commerce, has employed hundreds of employees, and otherwise has

been an employer within the meaning of 42 U.S.C. § 2000(b).

## Relevant Background

7.   The Plaintiff has been employed at all relevant times by Defendant as an Employee

Retirement Income Security Act ("ERISA")/Bankruptcy attorney.  It is fundamental to

note that she engaged in EEO activities prior to the events leading to the claims brought

in this action including testifying in EEO proceedings.  Plaintiff also served as a

representative in several EEO complaints brought by other PBGC employees including

the claims in *Dunwell v. PBGC*, EEOC Appeal No. 0120081804 (June 12, 2008) (EEOC

sustained the position of Ms. Dunwell, PBGC's only wheelchair-dependent employee,

that she was entitled to an investigation of her allegations including a claim that Agency

personnel unduly affected her ability to take bathroom breaks).

8.   At all relevant times, in addition to the government-wide rules and regulations, the

Defendant maintained certain relevant, important workplace rules and guidelines that

governed the conduct of all of its employees including the following:

   a.   Professional Courtesy Directive, which states that PBGC would not tolerate

   discourteous behavior and other forms of incivility which constitute

   unprofessional behavior and unacceptable conduct and that employees would be

   held responsible for inappropriate behavior.

   b.   Policy on Workplace Violence, which states that "violence, threats, harassment,

   intimidation and other disruptive behavior in [the PBGC] will not be tolerated."

   PBGC pledges that it would take all reports of violative incidents seriously.

   c.   Policy on Workplace Harassment, which expresses PBGC's "strong commitment"

   to provide a peaceful work environment and defines harassment as "unwelcome

   verbal or physical conduct that creates an intimidating, hostile, or offensive work

   environment which interferes with the individual's work performance" and

   further describes derogatory remarks and the unwanted invasion of an individual's

   personal space as unacceptable conduct.

9.   On October 2, 2002, Plaintiff filed a formal EEO complaint against PBGC to redress

workplace concerns in her department which adversely affected her as an African-

American employee.  On November 13, 2002, just six weeks after filing the complaint,

Plaintiff was verbally assaulted and physically accosted by an irate supervisor in her department, the Office of the General Counsel ("OGC"), while she was working in her small office. The supervisor was angry for some unknown and unspecified reason after a meeting they both attended.  He began to berate Plaintiff then backed her into the corner of her desk by advancing ominously into her office—invading her limited personal space.  The supervisor's conduct clearly violated the workplace rules detailed in paragraph 8 above. Plaintiff immediately reported the incident to PBGC management. Plaintiff initially sought an apology and the opportunity to discuss and address the incident with the supervisor so that the offending behavior would not reoccur with her or with any other PBGC employee.  Her requests were denied.

10. The labor management staff in PBGC's OGC and its Human Resources Department ("HRD"), both responsible for investigating employee complaints about issues in the workplace, failed to conduct an independent, objective investigation of the November 13, 2002 incident because of Plaintiff's prior and ongoing EEO activities.

11. On or about December 9, 2002, Plaintiff filed a grievance with OGC regarding the subject incident and PBGC's failure to investigate and take action to correct the offending behavior.  The grievance included a claim for retaliation based on OGC and HRD's failure to investigate and take appropriate corrective action in violation of Title VII.  PBGC officials denied Plaintiff's grievance at each step of the process.  Finally, on or about February 3, 2003, arbitration was invoked by the employee union at PBGC, NAGE Local R3-77, (the "Union"), on behalf of the Plaintiff, to address and resolve the issues raised in the grievance.

12. On August 19, 2003, the EEO claims filed in October 2002 were brought to this Court

for adjudication, Case No. 03-1759(ESH).  As is customary for federal government agencies, PBGC was represented by the United States Attorney Office for the District of Columbia in the action but released this representative and hired the private law firm of Seyfarth Shaw to represent it while the Plaintiff represented herself in the action.

13. In the spring and summer of 2004, Plaintiff proceeded to take depositions for her action pending in District Court.  Plaintiff sought official time for these deposition, which is normally-granted.  However, PBGC denied her request for official. Plaintiff was, therefore, required to use her personal leave to advance her case

14. In the summer of 2004, Plaintiff represented herself in the arbitration of her grievance with the assistance of union official Dwayne Jeffers.  At the time, Mr. Jeffers was the only PBGC employee serving as a union steward.

15. Because the offending acts described in paragraph 9 above were not addressed by PBGC management, Plaintiff logically assumed that they were condoned, which made her anxious and afraid in her workplace. No relief was granted even after the multiple inquiries and complaints to labor management officials were reported PBGC senior level officials.  This occurred even after Plaintiff clearly communicated the emotional impact these incidents at PBGC were having on her and her ability to function at her normal professional level.  It is relevant to note that just six weeks prior to the November 13, 2002 incident, Plaintiff was evaluated at a very high rating of 90% effective in her 2002 fiscal year performance appraisal.  A year later, Plaintiff was judged barely able to meet the basic requirements of her position.

16. The Plaintiff subsequently sought the advice and assistance of PBGC's EEO Office after she was subjected to hostile treatment by the OGC labor and employment employees

including long-term and current Deputy General Counsel for Labor and Employment
Law, Philip Hertz.

17. PBGC filed several pre-trial motions in efforts to dismiss Plaintiff's arbitration and limit
the production of relevant evidence.  At the same time, the Union was placed in
trusteeship by its parent organization, the National Organization of Government
Employees ("NAGE"), which also attempted to have Plaintiff's case withdrawn or
dismissed.

18. On or about April 26, 2005, the arbitrator issued a decision in the subject arbitration
matter.  The arbitrator found PBGC liable for multiple violations of Plaintiff's rights
including violations of various provisions of the Collective Bargaining Agreement
between NAGE and PBGC ("CBA"), applicable federal labor laws, Title VII as well as
PBGC's own workplace rules (including several listed in paragraph 8 above).

19. Specifically, the arbitrator found that the conduct of officials in HRD and OGC,
including PBGC's Deputy General Counsel Philip Hertz, Assistant General Counsel Jay
Resnick, and HRD supervisor Richard Lattimer violated Plaintiff's Title VII rights by
their intentional failure to conduct an impartial investigation into Plaintiff's complaint
about violative conduct of an OGC supervisor as a direct result of Plaintiff's engagement
in prior EEO-protected activity.  The arbitrator also found that the supervisor violated
PBGC's Policy on Workplace Violence and its Professional Courtesy Directive when he
assaulted and accosted the Plaintiff; and that PBGC's General Counsel violated the
Professional Courtesy Directive in his reaction to Plaintiff's report of the incident.

20. The arbitrator retained jurisdiction to determine damages due the Plaintiff.  He first
ordered the parties to attempt to resolve the arbitration before holding additional

hearings.  PBGC then expanded the role of Seyfarth Shaw (discussed in paragraph 12 above) to include the handling of the arbitration matter.  The parties were unable to reach a settlement of the claims.

21. To date, based on information obtained through FOIA requests to PBGC, the Agency has paid Seyfarth Shaw almost $1 million for its representation in two actions in which Plaintiff represented herself (one before this Court and the other the arbitration discussed above).  In addition to the attorneys retained from Seyfarth Shaw, PBGC assigned two in-house attorneys, including Raymond Forster, to represent the Agency against actions taken by the Plaintiff. Mr. Forster had previously represented PBGC on complaints filed by the Plaintiff dating from her 2002 EEO claims against PBGC and was one of the OGC employees whose hostilities Plaintiff reported to PBGC as early as 2004.

22. On July 15, 2008, the arbitrator issued a decision that ordered PBGC to, *inter alia*: (a) post a notice in the common areas of the Agency noting its violation of Plaintiff's rights, (b) restore hundreds of hours of sick and annual leave Plaintiff used as a result of the adverse impact of the misconduct of PBGC officials on her health, and (c) grant Plaintiff a six-figure compensatory award for the mental and emotional harm she suffered including post-traumatic stress disorder.  PBGC appealed the arbitrator's decisions.  In the meantime, Plaintiff continues to experience ongoing humiliation and hostilities in the workplace, principally from PBGC labor management officials.  Officials in OGC and HRD failed to either properly investigate or take corrective action to end their misconduct towards Plaintiff.

**Factual Allegations**

23. In the Spring of 2005, several PBGC contract employees were fired and others

disciplined for sending inappropriate emails over PBGC's official computer system. PBGC's actions unfairly and disparately affected African-American employees. This situation inflated tension in the workplace and caused serious rifts among employees affected by PBGC's sudden and dramatic actions.

24. Plaintiff was aware that PBGC's actions were initiated by a highly incendiary sexual email forwarded to senior level PBGC officials by Robert Perry. At the time, Mr. Perry was under investigation by PBGC for inappropriate sexual conduct in the workplace and sought to defend himself by alleging sexual improprieties of other PBGC employees. Plaintiff advised Mr. Perry not to send the email, but the previously-mentioned Union representative Dwayne Jeffers advised him to send the email. When this action lead to problems for other PBGC employees, Plaintiff disclosed the facts surrounding the Agency's actions to assist some of the affected employees in their disciplinary actions. It is again important to note that both Messrs. Perry and Jeffers had pending EEO complaints against PBGC.

25. During this period, flyers were disseminated in the workplace about the situation described above. The flyers stated that Robert Perry and, to a lesser extent, Dwayne Jeffers, were responsible for causing PBGC to scan its entire computer network for inappropriate emails, which lead to the firing of multiple contract employees and the disciplining of several federal employees.

26. Subsequently, both Robert Perry and Dwayne Jeffers became hostile towards the Plaintiff because of she informed affected employees of the facts behind PBGC's actions. In retaliation, Mr. Jeffers began disseminating emails about the Plaintiff that were, among other things, highly personal, inflammatory, defamatory, libelous, and

intimidating alleging that Plaintiff was "psychotic" and associated with pornographers. The emails were distributed on PBGC's official email system. Included in the distributed emails was a labor management official in PBGC's HRD, one of the departments previously found liable for violating Plaintiff's Title VII rights.

27. Beginning on April 8, 2005, Plaintiff filed several complaints with PBGC's HRD regarding Mr. Jeffers' inappropriate and harmful emails. She received no response despite the fact that PBGC previously imposed a multi-day suspension on Mr. Jeffers for misconduct, which violated Agency rules. Due to HRD's failure to respond to Plaintiff's reports, Plaintiff filed an EEO claim challenging PBGC's repeated failure to respond to her reports of inappropriate conduct towards her in the workplace. Conduct that was clearly in violation of the workplace rules described in paragraph 8 above.

28. On June 16, 2005, PBGC sent a memo, via email, to all of its employees regarding the "[i]nappropriate use of PBGC Resources." The HRD official the arbitrator noted as committing intentional retaliation against Plaintiff, Richard Lattimer, sent a subordinate to obtain Plaintiff's signature acknowledging that she received the subject email. This unprecedented request was made just two months after the arbitrator issued his decision in which Mr. Lattimer's conduct resulted in HRD being found liable for violating Plaintiff's rights including her rights under Title VII. Mr. Lattimer ordered this signature from only Plaintiff and from two other employees—who also, incidentally, had EEO claims against PBGC for actions that included misconduct by PBGC labor management employees including Mr. Lattimer. Mr. Lattimer sought Plaintiff's signature without the benefit of an investigation to determine whether or not the Plaintiff was responsible for the flyers or had committed any violations of PBGC's workplace rules. The Plaintiff

refused to sign the acknowledgement because she felt it was retaliatory, selectively disparate and intended only to continue to the harassment against her.

29. The Plaintiff's supervisor, Charles Finke, was subsequently contacted and a meeting arranged for the purpose of obtaining Plaintiff's signature acknowledging receipt of the June 16, 2005 email.  The HRD official who attended the meeting made serious allegations in front of the Plaintiff's supervisor about Plaintiff's actions including that she disseminated inappropriate information in the workplace, namely the flyers described in paragraph 25.

30. Plaintiff immediately reported the conduct of these HRD officials to PBGC because of her concern that these officials were retaliating against her and intentionally acting to disrupt her professional relationship with her supervisor by falsely alleging that she disseminated inappropriate information in the workplace.  PBGC again failed to respond or to otherwise follow its workplace rules to investigate if action was necessary to correct the conduct of its HRD officials towards Plaintiff.  Therefore, Plaintiff filed an EEO complaint seeking redress for PBGC's ongoing failure to act and its discriminatory and retaliatory actions.

31. In November 2005, PBGC hired the law firm of Littler Mendelson to conduct an official investigation into several complaints related to the dissemination of inappropriate information in the workplace.  This investigation included not only reports made by Plaintiff but also allegations of misconduct made against Plaintiff by Robert Perry and Dwayne Jeffers.  Plaintiff cooperated with the investigation and provided information to assist in the investigation of workplace issues caused by the conduct of PBGC labor management officials.

32. In January 2006, Plaintiff's email access to Robert Perry and Dwayne Jeffers were blocked with no prior notice to Plaintiff about PBGC's decision to block emails from her to these Union officials (Mr. Perry was also serving as a Union official at this time). Plaintiff's emails were specifically related to her ongoing arbitration matter and were sent to Messrs. Perry and Jeffers in their capacity as Union officials.  Plaintiff had to file yet another report about this sudden and capricious denial of a key means of communication between Plaintiff and the Union.

33. In or about February 2006, PBGC sent Plaintiff a letter stating that the Littler Mendelson investigation was completed and that no violation of PBGC workplace rules were found because the conduct complained of was union activity.

34. Also in February 2006, PBGC labor management officials reported Messrs. Perry and Jeffers in Plaintiff's arbitration and sought sanctions for their violation of a protective order in the arbitration.  PBGC appeared to take no action against these employees for their infraction, which was apparently committed over PBGC's email system.

35. At a meeting in November 2006, Plaintiff and PBGC learned that Dwayne Jeffers had taken the record in her arbitration and sent it to the private lawyer he and Mr. Perry were using to prosecute their claims against PBGC.  Mr. Jeffers sent the confidential protected information, which included some of Plaintiff's private medical records, to his attorney. He stated that this was pursuant to a subpoena sent to him.  However, the subpoena was sent to Mr. Jeffers in his status as a private individual and not as a labor official.  PBGC, again, failed to take appropriate corrective action to address the conduct of this employee who it had previously suspended for other misconduct and was aware that he had previously misused Plaintiff's arbitration information.

36. On January 11, 2007, the primary OGC attorney representing PBGC in Plaintiff's EEO complaints, Raymond Forster, sent an email to several PBGC employees, including Deputy General Counsel Philip Hertz, which stated that Plaintiff experienced "litigation induced hallucinations" in a message ostensibly intended to advise employees that an arbitration hearing was being held on the floor that day.   The email was then forwarded by a recipient to more than 60 OGC employees, which means a minimum of 60 PBGC employees were exposed to Mr. Forster's highly defamatory statement about Plaintiff.

37. Plaintiff learned of the email shortly after it was sent when an OGC employee informed her of the statements made about her in the email and later provided Plaintiff with a copy of the subject email.  Plaintiff immediately reported the matter to HRD for an investigation of Mr. Forster's conduct which was in violation of the workplace rules detailed in paragraph 8 above.  PBGC, again, failed to investigate Plaintiff's complaint and refused to take any disciplinary action against Raymond Forster for his publication of defamatory allegations using PBGC's email system—the same conduct proscribed in paragraph 28.  Plaintiff also reported Mr. Forster for obviously falsely characterizing the target of his statement in the email with contradictory statements to a variety of officials including the arbitrator.  Furthermore, Plaintiff expressly asked PBGC's labor management officials to take action to remedy the widespread dissemination of the email.  PBGC, again, failed to take action to redress an obvious violation of its workplace rules.

38. In April 2007, Plaintiff became the president of the Union at PBGC, NAGE Local R3-77 (the "Union").  PBGC labor management officials then escalated their mistreatment of her while she was attempting to conduct her duties as Union president and still manage a

caseload as an ERISA/Bankruptcy attorney.  On numerous occasions from April 2007

through the end of her tenure as Union president in March 2009, PBGC labor

management officials took numerous actions, some described below, against her to not

only disrupt her ability to fulfill her duties to the 500-member bargaining unit, but

importantly for this action, to disrupt Plaintiff's ability to handle her ERISA/Bankruptcy

duties as well.  Plaintiff made numerous reports of PBGC officials like HRD labor

management official, Ruben Moreno, who repeatedly yelled at and physically

intimidated Plaintiff.   These reports went either ignored or appropriate corrective action

was not taken and the behavior continued.

39. In November 2007, after another period of absence from the workplace for health

reasons related to the stressors at PBGC.  Plaintiff returned to work and personally

overheard unprofessional harassment of an employee who had previously engaged in

EEO protected activity by testifying about the conduct of the person engaged in

harassing her, Sherry Mathes, a team leader.  PBGC had taken no action to stop a pattern

of mistreatment in this specific division that was reported to Agency officials.

Therefore, Plaintiff and the Union filed an institutional grievance (the "Union

Grievance") against PBGC for the entire division of employees who previously testified

that they were either personally harassed or witnessed their colleagues being harassed.

Many of the aggrieved believed that race discrimination was a cause of this behavior.

They later believed they were subjected to retaliation because of their participation in an

EEO investigation in which they testified about the harassment and discrimination in

their division.

40. Instead of abating the conduct after reports were made to HRD, HRD labor management

official Ruben Moreno instructed Ms. Mathes to send emails to the employee who first

filed the EEO complaint and to counsel the employee regarding performance

deficiencies.  It is important to note that this employee was rated "excellent" in the prior

year.  After counseling her about alleged deficiencies, the employee's performance

rating for the next fiscal year was downgraded in every rating objective.  As a team

leader, Ms. Mathes did not have the authority to counsel the employee for performance

issues—that role and responsibility belonged to the division manager who is Robert

Callahan.  However, Ms. Mathes had significant input into the employee's performance

rating.  This heightened the Union's determination to prosecute the claims in the Union's

Grievance noted in the preceding paragraph.

41. Mr. Moreno and PBGC's response to the Union's Grievance was extremely hostile.  It

was denied and the Union, under the Plaintiff's leadership, took it to arbitration in 2008.

Plaintiff and another Union officer, Richard Anderson, an accountant, represented the

Union against PBGC, which had four labor and employment attorneys represent it at the

arbitration hearings.  Attorneys Raymond Forster and Scott Schwartz were included in

PBGC's expansive legal team.

42. During the arbitration proceeding—from June to August 2008—PBGC, principally

through its labor and employment attorney Scott Schwartz, alleged that the Union

maintained the arbitration only to obtain evidence for several pending EEO complaints in

the division—expressing its concern for the impact of the arbitration on its potential

liability regarding several EEO actions pending against PBGC in that division.

43. The arbitration hearings were extremely contentious.  From the start, PBGC fought

against providing critical evidence to necessary support the Union's allegations, which

included the file on its investigation into employee complaints about the conduct.  In

fact, on the first day of the hearings, PBGC refused to comply with the arbitrator's

instruction to produce Philip Hertz, PBGC's Deputy General Counsel for Labor and

Employment law.   Mr. Hertz was the first witness called by the Plaintiff, the Union's

president and representative handling this matter.  He was called to testify about his role

in the investigation of employee harassment complaints, which were the subject of the

Union's Grievance.

44. One day during the arbitration hearing, it became so contentious that the arbitrator

angrily walked out, took the court reporter with him and told the parties to let him know

when they were ready to proceed.  Upon the arbitrator's departure, PBGC's attorney

Scott Schwartz and Plaintiff had a heated verbal exchange.  Mr. Schwartz turned to Mr.

Anderson and told him he should overthrow Plaintiff as Union president and take over

the Union because Plaintiff was "not giving PBGC anything."  Plaintiff asked Mr.

Schwartz, who had only represented PBGC on EEO matters, which of the employees

with pending EEO cases he wanted her to "give" to PBGC and she listed several

employees struggling under the burden of discrimination and retaliation from various

agency officials whose cases PBGC had refused to resolve.   Mr. Schwartz could not

respond with what specifically Plaintiff did not "give" PBGC, but his upset about the

Plaintiff's aggressive defense of employees in the Union's Grievance was very clear on

the record.  It is important to note that Plaintiff was one of only two attorneys actively

representing employees in EEO actions against PBGC during this period.

45. At the end of the arbitration hearings in August 2008, Plaintiff argued for sanctions

against PBGC for violating the arbitrator's express order to produce Deputy General

Counsel, Philip Hertz, a material witness for the Union's case. The arbitrator sanctioned PBGC for its violation and required it to pay the costs of the Union's transcripts for the 13 days of hearings, at a cost of more than $18,000.

46. After the hearings, Mr. Schwartz filed a motion with the arbitrator seeking sanctions against Plaintiff for alleged violations of her ethical responsibilities as an attorney with specious allegations about Plaintiff's vigorous representation of the Union and employees' rights.  Plaintiff complained to PBGC officials about this motion because it was clearly done to retaliate against her for bringing and advancing the Union's Grievance.  More importantly, it highlighted a continuing pattern by PBGC labor management officials who file EEO or represent EEO claims against PBGC.  For example, during the arbitration hearing, PBGC objected to another ERISA/Bankruptcy attorney assisting Plaintiff with the proceeding because they alleged there was a pending ethics charge against the attorney before the D.C. Bar.  While PBGC made this assertion to the arbitrator, they continued to use the attorney to represent them in ERISA/Bankruptcy matters before federal courts.

47. PBGC officials, again, took no corrective action against its labor management employee for his vicious and unfounded attack on the foundation of Plaintiff's employment—her legal license.  The arbitrator, however, summarily denied it.

48. The undue pressures placed on Plaintiff by PBGC's labor management and senior level officials through the ongoing failure to react to Plaintiff's multiple reports of her mistreatment impacted her ability to function including in her ERISA/Bankruptcy duties. Plaintiff was initially rated "fully effective" for fiscal year 2008.  However, when she explained the situation and her time-consuming involvement with PBGC's labor

management officials to her supervisor, the rating was changed to "excellent" to reflect the reality of the limited time she was left with to handle her ERISA/Bankruptcy duties.

49. Despite PBGC senior management officials receiving numerous complaints from Plaintiff about the afore-mentioned Mr. Moreno's conduct, there was no response from them until November 2008. During labor management negotiations on November 18, 2008, Mr. Moreno erroneously exclaimed that Plaintiff commented that PBGC's Director—a married man with many children including a baby—was having an affair with its HRD Director. This statement caused an uproar, including from the other PBGC representatives in the room. These employees quickly took Mr. Moreno out of the room and could be heard scolding him. Plaintiff reported this defamatory and outrageous conduct to PBGC senior officials. It is telling that this report got a response from PBGC management. Instead, however, of taking action against Mr. Moreno, PBGC's Chief Management Officer Stephen Barber told everyone, including Plaintiff and the other Union representatives who were present during this exchange, that they could be subjected to disciplinary action for conduct during the negotiations.

50. From 2008 to late 2009, Plaintiff received several specific warnings from employees in HRD that she needed to be careful because officials like Mr. Moreno were after her.

51. In or around January 2009, during a tumultuous period in the Union where NAGE was seeking to withdraw as the representative of PBGC's bargaining unit employees, Plaintiff's supervisor, Joan Segal, informed her that Mr. Moreno told her that Plaintiff was no longer allowed Union and EEO time and that she was to increase Plaintiff's ERISA/Bankruptcy workload. This order was given despite the fact that NAGE's petition to withdraw as the exclusive representative of PBGC's bargaining unit

employees was not granted by the Federal Labor Relations Authority ("FLRA") until the certificate was officially withdrawn in March 2009. Plaintiff's supervisor stated that she had never been spoken to in that manner before and that Mr. Moreno appeared agitated and that saliva from his mouth fell on her while he spoke to her. Even in recounting the meeting with Mr. Moreno, the supervisor was visibly upset. This supervisor resigned from PBGC shortly after this incident.

52. Contemporaneous with this event, another PBGC employee, Richard Anderson, informed Plaintiff that Mr. Moreno approached him while he was having lunch and began talking to him. Mr. Moreno began making statements about Plaintiff including telling Mr. Anderson that he investigated Plaintiff for misconduct in the workplace. Plaintiff reported this to PBGC officials in HRD for investigation because she had never been subjected to any investigation by Mr. Moreno and she wanted his ongoing defamatory and retaliatory actions towards her to stop. Furthermore, Mr. Moreno was not authorized to make such a sensitive disclosure to another employee.

53. Indeed, PBGC took advantage of the actions of NAGE and its petition to the FLRA and the December 31, 2008 issuance of a decision by the Washington Regional Office of the FLRA approving NAGE's petition to withdraw its representation subject to a 60-day appeal period by informing Plaintiff and the bargaining unit in January 2009 that the Union no longer existed. PBGC then discontinued official time to handle Union matters, closed the Union office with EEO case files and other records in it and, more significantly, Scott Schwartz immediately wrote to the arbitrator and informed him that the arbitration over the Union's Grievance was over because the Union no longer existed. This prematurely discontinued the arbitration over matters that PBGC obviously

sought with all its resources to bury.

54. On May 8, 2009,  Plaintiff learned that Scott Schwartz took the unprecedented step of contacting the supervisor of another ERISA/Bankruptcy attorney who was working with Plaintiff on several EEO actions filed by a disabled PBGC employee. Mr. Schwartz inquired about the attorney's use of official time to work on the EEO cases.  These cases began when the Union still existed and Plaintiff and the attorney began working on the cases at that time.  After Mr. Schwartz's inquiry, the attorney was denied official time to work on the EEO cases and was visibly shaken by the incident.  Plaintiff properly reported Mr. Schwartz's conduct to the EEOC judge and to PBGC's EEO Office and other PBGC officials.  Mr. Schwartz apparently informed the supervisor of these reports because this supervisor, who was previously friendly and collegial towards Plaintiff, became visibly upset at Plaintiff after the incident.  Indeed, the Plaintiff's request to this supervisor for assistance in an ERISA matter, for which she is the department's subject matter expert, received no substantive response or suggestions on how Plaintiff should handle the matter.

55. In August 2009, Plaintiff was deposing Mr. Moreno in an EEO action brought by Richard Anderson, one of the employees involved in the Union's Grievance as a witness and Union representative.  In addition to Plaintiff, Mr. Anderson and Mr. Moreno, PBGC attorney Scott Schwartz was also present.  During a break in the deposition, Mr. Moreno suddenly started an angry barrage against Plaintiff.  Before she said anything in response, Plaintiff looked to Agency counsel Mr. Schwartz expecting him to intervene and stop this violative conduct.  Instead, Mr. Schwartz just sat by and allowed Mr. Moreno to continue his tirade during which Mr. Moreno angrily pounded the table with

his fists.  After the incident, Plaintiff reported the conduct to PBGC officials.  PBGC, again, failed to take corrective action. This, despite the numerous prior reports about this employee from Plaintiff and other PBGC employees who filed EEO actions against the Agency because of Mr. Moreno's conduct.

56. Plaintiff's mistreatment and harassment in the workplace, which was condoned by PBGC officials, took a new manifestation.  Various PBGC employees who were aware of the Agency's mistreatment of Plaintiff and its failure to protect her from violative behavior escalated the hostilities Plaintiff faced in the workplace by subjecting her to additional misconduct. For example in September 2009, Plaintiff was accused of harassment, via email to several management officials including various HRD officials and Plaintiff's department director by Michael O'Connell.  Mr. O'Connell alleged that he was harassed via email.  The email he provided as proof, on its face demonstrated that Plaintiff had not violated PBGC's rules and instead were union related communication. In response to Mr. O'Connell's complaint, PBGC officials ordered an immediate investigation of Plaintiff subjecting her to an investigative interview that lasted more than two hours.  During the interview, Plaintiff disclosed various actions by certain PBGC employees who were hostile towards her, including Mr. O'Connell.  PBGC again failed to appropriately apply its workplace rules through the conduct of an objective investigation—leaving Plaintiff to exist in a workplace rife with hostilities and stressors.

57. Despite her best efforts to diligently complete her ERISA/Bankruptcy duties, Plaintiff was rated only effective for the 2009 fiscal year.  She was told by her supervisor that she would have been rated higher, but for her "running around" with the issues she had to deal with from the Union particularly after PBGC precipitously and unlawfully withdrew

its recognition of the Union in January 2009.  After discussing her evaluation, her supervisor increased her score in a couple of objectives, but her overall rating remained unchanged.  This resulted in the loss of a performance award.

58. As mentioned in paragraph 56, Plaintiff also experienced mistreatment and direct challenges from PBGC employees.  In her ERISA/Bankruptcy work, she was subjected to harassment and mistreatment from employees like Richard Lattimer and his subordinate, Gilbert Martinez.  It is important to note that Mr. Lattimer transferred from HRD to work on ERISA/Bankruptcy matters.  For example, in September 2009, Plaintiff complained to PBGC about Mr. Martinez's unprofessional conduct towards her on a very time sensitive case to which they were both assigned.  Mr. Martinez actively ignored Plaintiff's role as the staff attorney on the case and took issues and concerns directly to her supervisor  cutting Plaintiff out of the normal communication loop. Plaintiff informed HRD labor management officials of Mr. Martinez's conduct, including his angrily walking out of a meeting Plaintiff called to try to get him to complete work that was urgently needed on the case.  Mr. Lattimer was aware of Mr. Martinez's failure to advance his work on the case.  However, instead of dealing with his employee's misconduct, Mr. Lattimer contacted Plaintiff's supervisor to complain about her actions in the case.  Mr. Martinez's department handled the obvious problems created by his conduct by assigning several other staff members to complete Mr. Martinez's work.  When Mr. Lattimer was out of the office, Suzanne Kelly was assigned to supervise the case.  At times, Mr. Martinez directly ignored or contravened instructions from Ms. Kelly, especially if he knew they were as a result of requests from Plaintiff.  This caused major disruptions for not only the Plaintiff, but for other PBGC

staff on the case.  An auditor expressed his frustration to Plaintiff stating that he worked with Mr. Martinez before and he had not experienced the strange behavior Mr. Martinez was exhibiting in Plaintiff's case.  Behavior that seemingly was concentrated only on Plaintiff. When this was reported to HRD labor management officials, they again failed to take appropriate corrective action to address the results of Messrs. Martinez and Lattimer's handling of the case.  This resulted in PBGC unnecessarily expending additional staff resources to resolve the very time sensitive issues in the case.  Mr. Martinez continues his open hostilities towards Plaintiff while they continue their work to represent PBGC's interests in the case.

59. A consistent actor in the few investigations PBGC undertook in response to Plaintiff's complaints is Deputy General Counsel Philip Hertz.  He is a part of the Harassment Investigation Committee ("HIC"), which PBGC instituted after it lost the decision in Plaintiff's grievance arbitration.  The HIC and Mr. Hertz have been a part of most, if not all, of PBGC's "investigations" into Plaintiff's complaints about her mistreatment in the workplace from its inception, and have taken essentially the same position in just about every complaint Plaintiff has made to it about her mistreatment in the workplace.

## Count I
## Retaliation

60. Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 59, above.

61. PBGC has a pattern of engaging in retaliatory conduct against employees who engage in EEO protected activity including employees like Valda Johnson who has a pending action in this Court, Case No. 06-00399 (EGS).  Ms. Johnson's claims are similar to Plaintiff's claims and are made against some of the same labor management officials.  In

the last few years, Plaintiff served as the representative in several individual EEO cases and the Union's Grievance that involved similar discriminatory and retaliatory conduct by PBGC's labor management officials who retaliated against employees engaged in EEO protected activity.

62. Indeed, Robert Perry, in Case Nos. 03-2495 and 04-1996(CKK) secured a settlement from PBGC partly for his allegations that PBGC retaliated against him by improperly subjecting him to investigation for conduct that was not reported to PBGC, but which PBGC learned of through its active monitoring of the challenge of NAGE's trusteeship of the Union, Case No. 03-2513(ESH).  Dwayne Jeffers also obtained settlement of his claims, including retaliation allegations, against PBGC despite his prior disciplinary record, Case No. 03-1762(RMC).  These employees, like Plaintiff, actively engaged in EEO protected activities by testifying in EEO cases and representing PBGC employees.

63. Plaintiff alleges that PBGC willfully, intentionally, maliciously and unlawfully retaliated against her in its continuous and ongoing failure to investigate complaints of highly inappropriate conduct towards her.

64. Defendant PBGC's actions were based on its desire to retaliate against Plaintiff, again and again, for her prior and ongoing EEO activities including the positive outcome in the arbitration of her grievance, which found PBGC liable for intentional retaliation in violation of Title VII.

65. As a direct result of PBGC's intentional actions, Plaintiff has suffered physical, emotional, mental and economic damages; including but not limited to, emotional pain and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping and functioning, humiliation and fear, and loss of past, present and potential loss of

future income and benefits.

## Count II
## Retaliation Based on a Hostile Work Environment

66.  Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 65, above.

67. Plaintiff alleges that PBGC willfully, intentionally, maliciously and/or unlawfully allowed the maintenance and perpetuation of a hostile environment where employees felt free to disseminate inflammatory, defamatory, libelous, and intimidating emails and to make unfounded, harmful, allegations about Plaintiff to others as well as verbally assault, physically intimidate, harass and otherwise mistreat Plaintiff without fear of management intervention and censure.

68. The harassment and hostile work environment including PBGC's failure to take appropriate corrective action was so severe and/or pervasive that it altered the terms and conditions of Plaintiff's employment and created a very abusive atmosphere.  Plaintiff is objectively and subjectively concerned about her future employment including her ability to remain in the PBGC workplace.  Indeed, Plaintiff's doctor recently ordered that she work from home for a period of time to avoid the adverse health consequences caused by the hostilities in her work environment.

69.  Defendant PBGC's actions were based on its desire to again retaliate against Plaintiff for her prior and ongoing EEO activities as well as the positive outcome in the arbitration of her grievance, which found PBGC liable for intentional retaliation in violation of Title VII.

70. As a direct result of PBGC's intentional actions, Plaintiff has suffered physical, emotional, mental and economic damages; including but not limited to, emotional pain

and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping and functioning, humiliation and fear, and loss of past, present and potential loss of future income and benefits.

## Count III
## Race Discrimination

71.  Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 70, above.

72. Plaintiff alleges that PBGC willfully, intentionally, maliciously and/or unlawfully failed and refused to grant Plaintiff the conditions of employment she was entitled to through the application of, *inter alia*, PBGC's workplace rules.

73. Similarly situated Caucasian employees are provided the benefits of the conditions of employment provided for by PBGC's workplace rules.  For example, Plaintiff is aware that a similarly situated white OGC attorney had their complaint of workplace harassment promptly investigated and discipline proposed in less than two months.

74. As a direct result of PBGC's intentional actions, Plaintiff has suffered physical, emotional, mental and economic damages; including but not limited to, emotional pain and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping and functioning, humiliation and fear, and loss of past, present and potential loss of future income and benefits.

## Count IV
## Race Discrimination Based on a Hostile Work Environment

75. Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 74, above.

76. Plaintiff alleges that PBGC willfully, intentionally, maliciously and/or unlawfully

allowed the maintenance and perpetuation of a hostile environment where employees felt free to disseminate inflammatory, defamatory, libelous, and intimidating emails and to make unfounded, harmful, allegations about Plaintiff to others as well as verbally assault, physically intimidate, harass, and otherwise mistreat Plaintiff without fear of management intervention and censure.

77. PBGC has promptly responded to complaints by Caucasian employees including a similarly situated employee in OGC whose complaint was entrusted to a Deputy General Counsel for an investigation that was completed in less than one month.

78.  The harassment and hostile work environment including PBGC's failure to take appropriate corrective action was so severe and/or pervasive that it altered the terms and conditions of Plaintiff's employment and created a very abusive atmosphere.  Plaintiff is objectively and subjectively concerned about her future employment including her ability to remain in the PBGC workplace.

79.  As a direct result of PBGC's intentional actions, Plaintiff has suffered physical, emotional, mental and economic damages; including but not limited to, emotional pain and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping and functioning, humiliation and fear, and loss of past, present and potential loss of future income and benefits.

<u>**Count V**</u>
<u>**Sex Discrimination**</u>

80. Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 79, above.

81. Plaintiff alleges that PBGC willfully, intentionally, maliciously and/or unlawfully failed and refused to grant Plaintiff the conditions of employment she was entitled to through

the application of, *inter alia,* PBGC's workplace rules.

82. Similarly situated male employees are provided the benefits of the conditions of employment provided for by PBGC's workplace rules.  For example, Plaintiff is aware that males, especially white males, are not only treated preferentially in investigations, but also in the discipline that PBGC imposes.  In addition to the male supervisor who was not disciplined for his 2002 violent conduct towards Plaintiff, most of the key labor management officials Plaintiff complained of were male.

83.   As a direct result of PBGC's intentional actions, Plaintiff has suffered physical, emotional, mental and economic damages; including but not limited to, emotional pain and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping and functioning, humiliation and fear, and loss of past, present and potential loss of future income and benefits.

## Count VI
## Sex Discrimination Based on a Hostile Work Environment

84. Plaintiff adopts and incorporates by reference all of the allegations contained in paragraphs 1 through 83, above.

85. Plaintiff alleges that PBGC willfully, intentionally, maliciously and/or unlawfully allowed the maintenance and perpetuation of a hostile environment where employees felt free to disseminate inflammatory, defamatory, libelous, and intimidating emails and to make unfounded, harmful, allegations about Plaintiff to others as well as verbally assault, physically intimidate, harass, and otherwise mistreat Plaintiff without fear of management intervention and censure.

86. PBGC has promptly responded to complaints by male employees including a similarly situated employee attorney in OGC whose complaint of an incident, which occurred

during a Union meeting, was not only quickly investigated, but the PBGC labor

management employee investigating the allegation contacted other employees about

other incidents involving the target of its investigation, a long-time activist against

PBGC's discriminatory and retaliatory practices.

87.  The harassment and hostile work environment including PBGC's failure to take

appropriate corrective action was so severe and/or pervasive that it altered the terms and

conditions of Plaintiff's employment and created a very abusive atmosphere.  Plaintiff is

objectively and subjectively concerned about her future employment including her

ability to remain in the PBGC workplace.

88.  As a direct result of PBGC's intentional actions, Plaintiff has suffered physical,

emotional, mental and economic damages; including but not limited to, emotional pain

and suffering, anxiety, depression, stress, loss of focus, aggravation, difficulty sleeping

and functioning, humiliation and fear, and loss of past, present and potential loss of

future income and benefits.

## **Relief Requested**

WHEREFORE, Plaintiff Rhonda Baird prays this Court grant the following relief:

(a)    A declaratory judgment that Defendant's actions were taken against her in

retaliation for her prior and ongoing EEO activities, and because of her race and

sex;

(b)    An injunction enjoining Defendant PBGC from engaging in any future

discriminatory or retaliatory conduct towards Plaintiff;

(c)    A judgment awarding Plaintiff all out-of-pocket expenses and costs proximately

resulting from Defendant's conduct in an amount appropriate to the proof adduced

at trial;

(d)     Restoration of annual, sick and compensatory leave, including advanced leave, used

by Plaintiff directly and indirectly as a result of Defendant's misconduct, its failure

to respond to that misconduct, and the failure to enforce its codified workplace rules

and federal civil rights laws;

(e)     A judgment awarding Plaintiff compensatory damages from the Defendant in an

amount appropriate to the proof adduced at trial;

(f)     A judgment awarding Plaintiff front pay damages from Defendant in an amount

appropriate to the proof adduced at trial;

(g)     A judgment ordering Defendant to post a notice of its discriminatory and retaliatory

conduct and an apology for its conduct;

(h)     A judgment awarding Plaintiff her costs to litigate this action and reasonable

attorney's fees, if any; and

(i)     Grant such other and further relief as the Court deems just and proper.

## **Jury Demand**

Trial by jury is demanded on all issues for which a jury trial is available.

Respectfully submitted,


  /s/ Rhonda Baird
Rhonda Baird, Pro Se
Plaintiff
13615 Layhill Road
Silver Spring, MD 20906
(301) 603-1641
rnbaird64@aol.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 19th day of February 2010, she served a copy of her First

Amended Complaint and Request for Jury Trial via email and ECF on the following persons:

        JEFFREY A. TAYLOR, D.C. BAR # 498610
        United States Attorney
        RUDOLPH CONTRERAS, D.C. BAR # 434122
        Assistant United States Attorney
        DIANE M. SULLIVAN, D. C. BAR # 12765
        Assistant United States Attorney
        Judiciary Center Building
        555 Fourth Street, N.W.
        Room E4919
        Washington, D.C. 20530
        (202) 514-7205

                <u>/s Rhonda Baird</u>
                Rhonda Baird